# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 15, 2011         Decided May 24, 2011

No. 10-1343

UNITED STATES POSTAL SERVICE,
PETITIONER

v.

POSTAL REGULATORY COMMISSION,
RESPONDENT

NATIONAL POSTAL MAIL HANDLERS UNION ET AL.,
INTERVENORS

On Petition for Review of an Order of the Postal Regulatory
Commission

*Paul D. Clement* argued the cause for the petitioner. *Jeffrey S. Bucholtz*, *Zachary D. Tripp*, *Paul A. Mezzina* and *Michael J. Elston*, Attorneys, United States Postal Service, were on brief.

*Bruce R. Lerner* and *Osvaldo Vazquez* were on brief for intervenor National Postal Handlers Union in support of the petitioner.

*Peter D. DeChiara* was on brief for *amicus curiae* National Association of Letter Carriers, AFL-CIO in support of the petitioner.

*Daniel Tenny*, Attorney, United States Department of Justice, argued the cause for the respondent. *Michael S. Raab*,

Attorney*, Stephen L. Sharfman*, General Counsel, Postal Regulatory Commission, *R. Brian Corcoran*, Assistant General Counsel, and *Richard A. Oliver*, Attorney, were on brief.

*Ian D. Volner*, *David M. Levy*, *David R. Straus*, *Michael W. Hall*, *Tonda F. Rush*, *William B. Baker*, *John M. Burzio*, *Thomas W. McLaughlin* and *Timothy L. Keegan* were on brief for intervenors Affordable Mail Alliance et al. in support of the respondent.

*Susan M. Collins*, pro se, was on brief for *amicus curiae* United States Senator Susan M. Collins in support of the respondent.

Before: HENDERSON, TATEL and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: Section 201(d) of the Postal Accountability and Enhancement Act of 2006 (PAEA or Act), Pub. L. No. 109-435, 120 Stat. 3198, generally limits annual increases in the postal rates for market dominant products to an amount equal to the change in the Consumer Price Index for All Urban Consumers (CPI-U). The United States Postal Service (Postal Service) filed a request with the Postal Regulatory Commission (Commission) to exceed the annual cap pursuant to section 201(d)(1)(E), which authorizes the Commission to "establish procedures whereby rates may be adjusted [above the annual CPI-U cap] on an expedited basis due to either extraordinary or exceptional circumstances," citing as the exigent circumstance the recent recession and declines in mail volume resulting therefrom. 39 U.S.C. § 3622(d)(1)(E). The Postal Commission denied the exigent rate request on the ground that the Postal Service failed to demonstrate, as required under the statutory language, that the proposed rate adjustments are "due to" the cited "extraordinary or exceptional circumstances." Although the Commission correctly construed "due to" to require a causal relationship between the exigent

circumstances' effects on the Postal Service and the amount of the above-cap rate increases, it incorrectly concluded the plain meaning of that phrase requires the proposed rate adjustments to be "tailored to offset the specific effects of the claimed exigency." Exigent Request Denial at 65. We therefore remand to the Commission so that it can exercise its discretion to construe the ambiguous language of section 201, explaining the extent of causation the Commission requires the Postal Service to demonstrate between the exigent circumstance's impact on Postal Service finances and the proposed rate increase.

## I.

PAEA, enacted on December 20, 2006, directed that the Commission establish by regulation within eighteen months (and revise thereafter as necessary) "a modern system for regulating rates and classes for market-dominant products."[1] 39 U.S.C. § 3622(a). The Act sets out various "objectives" for the Commission to "appl[y] in conjunction with [each other]" and enumerates fourteen "[f]actors . . . [to] take into account." *Id*. § 3622(b), (c). The Act also sets forth specific "[r]equirements" for the system, including an annual limit on the percentage changes in rates "equal to the change in the [CPI-U]." *Id*. § 3622(d)(1)(A). In addition, the Act directs the Commission to set a schedule for rates to change at regular intervals by predictable amounts and procedures for public notice and Commission review before a rate change takes effect. *Id*. § 3622(d)(1)(B)-(C). Notwithstanding the CPI-U limitation and the statutory procedural requirements, the Congress inserted a "safety valve" into the statute, which directs the Commission to

---

[1]The Postal Service's market dominant products are enumerated at 39 U.S.C. § 3621(a). *See* 39 U.S.C. § 102(8). The products at issue here are: First-Class Mail, Standard Mail, Periodicals, Package Services and Special Services.

> establish procedures whereby rates may be adjusted on an expedited basis due to either extraordinary or exceptional circumstances, provided that the Commission determines, after notice and opportunity for a public hearing and comment, and within 90 days after any request by the Postal Service, that such adjustment is reasonable and equitable and necessary to enable the Postal Service, under best practices of honest, efficient, and economical management, to maintain and continue the development of postal services of the kind and quality adapted to the needs of the United States.

*Id*. § 3622(d)(1)(E). Per the statute's directive, the Commission promulgated regulations establishing procedures for regulating market dominant rates, 39 C.F.R. pt. 3010, including the exception for above-CPI-U rate adjustments in extraordinary or exceptional circumstances, *id*. subpt. E (§§ 3010.60-.66).[2]

The Postal Service submitted its first above-cap "exigent" request under the new regulatory system on July 6, 2010. The request proposed "exigent prices representing an aggregate increase of approximately 5.6 percent . . . for implementation of new prices on January 2, 2011." Exigent Request of the U.S. Postal Service (Exigent Request), Docket No. R2010-4, at 1

---

[2] Regulation 3010.60 provides generally: "The Postal Service may request to increase rates for market dominant products in excess of the annual limitation on the percentage changes in rates described in § 3010.11(d) due to extraordinary or exceptional circumstances. Such requests will be known as exigent requests." The Postal Service's exigent request must include, inter alia, "[a] full discussion of the extraordinary or exceptional circumstance(s) giving rise to the request, and a complete explanation of how both the requested overall increase, and the specific rate increases requested, relate to those circumstances." 39 C.F.R. § 3010.61(a)(3).

(July 6, 2010). As the supporting exigent circumstance justifying the increases, the Postal Service cited "the dramatic, rapid and unprecedented decline in mail volume" in the short time since PAEA had been enacted. *Id*. According to the Postal Service, "mail volume stalled" in FY 2007, "then plunged" in FY 2008 and FY 2009, "falling a total of nearly 17 percent between FY 2006 and FY 2009." *Id*. The Service acknowledged that volume from "the long-term impact of electronic diversion ha[d] been widely acknowledged over the last 10 years" but asserted that "the depth and severity of the current recession—and its impact on mail volume—were unforeseeable," particularly given that "[h]istorically, mail volume has generally increased from year to year, and even in the comparatively few instances of decreases, they were of a much smaller order of magnitude." *Id*. at 6.

In a decision dated September 30, 2010, the Commission denied the exigent request, concluding that "the requested increases are not justified as lawful exigent rate adjustments." Order denying Request for Exigent Rate Adjustments, Order No. 547, Docket No. R2010-4, at 4 (Sept. 30, 2010) (Exigent Request Denial). The Commission agreed with the Postal Service that "the recent recession, and the decline in mail volume experienced during the recession," qualified as an "extraordinary or exceptional circumstance" under section 201(d)(1)(E). *Id*. at 3. The Commission concluded, however, that the rate request, as submitted, did not otherwise qualify for section 201(d)(1)(E)'s narrow exception to the statutory rate cap. The Commission explained that the "determination that 'extraordinary or exceptional circumstances' have occurred is not by itself sufficient to authorize the collection of rates in excess of otherwise applicable rate caps"—two additional statutory requirements must be satisfied: (1) "the proposed adjustment must be 'due to' the extraordinary or exceptional circumstances" and (2) the adjustment "must meet a 'reasonable and equitable and necessary' test." *Id*. at 53. "Together," the

Commission stated, "the three requirements (the existence of extraordinary or exceptional circumstances; the requirement that the adjustment be 'due to' those circumstances; and the requirement that the adjustment be reasonable and equitable and necessary) create a narrow exception to the general statutory rule that rates for market dominant products are limited by CPI-U-based rate caps." *Id*. at 54. Addressing the meaning of the statutory language, the Commission explained that the preposition "due to" "expresses a causal relationship," which mandates that the proposed exigent rate adjustments be causally related to the cited exigent circumstance. *Id*. In addition, the Commission continued, the "reasonable and equitable and necessary" language "provides context for the statutory [due to] command" and "implicitly" reinforces its causal requirement because "[f]or an adjustment to be 'due to' an extraordinary or exceptional circumstance, the Postal Service must show that the adjustment is a 'reasonable and equitable and necessary' way to respond to the circumstance." *Id*. at 55-56. Accordingly, the Commission denied the request on the ground the proposed rates are "not designed to respond to the recent recession, or its impact on mail volume." *Id*. at 3. The Commission found instead that they "represent an attempt to address long-term structural problems not caused by the recent recession," *id*., but rather by the inescapable fact that " '[t]he bulk of [the Postal Service's] costs are fixed by laws, contract or regulations and its operating flexibility is severely limited,' " *id*. at 61-62 (quoting Statement of Joseph Corbett, Postal Service Chief Financial Officer, at 2) (alterations in original).[3] In particular the

---

[3]According to the Commission, the "principal cause of the Postal Service's impending liquidity crisis" is PAEA's mandate that the Postal Service make a $5 billion payment each September through 2016 to prefund its Retiree Health Benefits Fund. Exigent Request Denial at 68; *see* PAEA § 803(a)(1)(B), 120 Stat. at 3251 (codified at 5 U.S.C. § 8909a(d)(3)(A)).

Commission found the Postal Service failed to "quantify the impact of the recession on postal finances, address how the requested rate increases relate to the recession's impact on postal volumes, or identify how the requested rates resolve the crisis at hand." *Id*. at 4.

**II.**

Because the Congress expressly delegated to the Commission responsibility to implement PAEA section 201, we review its interpretation under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). *See NetCoalition v. SEC,* 615 F.3d 525, 533 (D.C. Cir. 2010); *cf. U.S. Postal Serv. v. Postal Regulatory Comm'n*, 599 F.3d 705, 710 (D.C. Cir. 2010) (court must defer to and uphold as reasonable Commission's interpretation of PAEA § 404(e)(3) because "that provision was clearly delegated to the Commission to implement and thereby to interpret"). Under *Chevron* step 1, if the "Congress has directly spoken to the precise question at issue . . . , that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. Under *Chevron* step 2, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. In reviewing the Commission's Exigent Request Denial, we end our first inquiry at step 1 because the Commission based its interpretation on the "plain meaning" of the statutory language. Exigent Request Denial at 27; *see Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin*., 471 F.3d 1350, 1354 (D.C. Cir. 2006) ("*Chevron* step 2 deference is reserved for those instances when an agency recognizes that the Congress's intent is not plain from

the statute's face." (citing *PDK Labs., Inc. v. DEA*, 362 F.3d 786 (D.C. Cir. 2004))).[4]

First, we agree with the Commission that the plain meaning of "due to" mandates a causal relationship between the amount of a requested adjustment and the exigent circumstances' impact on the Postal Service. The plain meaning of "due to" is "because of." *See* Webster's Third New Int'l Dictionary 699 (1993); *see also* Exigent Request Denial at 54 ("According to Webster's *Third New International Dictionary* (G. & C. Merriam Co. 1966) the expression 'due to' means 'because of.' *Roget's 21st Century Thesaurus* (3rd ed. 2010) provides the following synonyms for the expression 'due to': 'by reason of'; 'by cause of'; 'by virtue of'; and 'as a result of.' Each meaning and synonym expresses a causal relationship and leads the Commission to conclude that the Postal Service's proposed adjustment must be causally related to the alleged extraordinary or exceptional circumstance."). Thus, under the plain meaning of the statutory language, a rate may be "adjusted on an expedited basis" only *because of* "extraordinary or exceptional circumstances."

The Postal Service acknowledges that the exigent adjustment must be triggered by the threshold presence of "extraordinary or exceptional circumstances." *See* Exigent Request at 6 ("The unprecedented drop in mail volume constitutes the 'extraordinary or exceptional circumstances' that trigger the need for an exigent increase."). It nonetheless disagrees with the Commission's interpretation that the *amount* of the adjustment is determined by the amount of the revenue lost due to the exigent circumstance—at least to the extent the

---

[4]Our second inquiry will require us to proceed to *Chevron* step 2 because the phrase "due to" has an additional—and ambiguous—meaning, which the Commission did not address. *See infra* pp. 9-11.

Commission imposed a "strict 'nexus' or offset test." The Commission's interpretation, the Postal Service maintains, is undercut by the placement of the phrase "due to" "in an inapposite statutory clause" rather than in the following clause which sets out the "statutory standard governing the merits of an exigent rate request," Pet'r's Br. 22-24, namely, that the adjustment be " 'reasonable and equitable and necessary to enable the Postal Service, under the best practices of honest, efficient, and economical management, to maintain and continue the development of postal  services of the kind and quality adapted to the needs of the United States," 39 U.S.C. § 3622(d)(1)(E). *See* Pet'r's Br. 26-27. The prepositional phrase, however, appears exactly where it belongs—up-front, alongside the directive that the Commission "establish procedures" for making an adjustment—which adjustment must therefore be "due to" the exigent circumstance.

Having concluded that the plain meaning of section 201 requires a causal relationship between the exigent circumstances and the proposed rate adjustments, we next consider how close the relationship must be, that is, how much of the proposed adjustment must be due to the exigent circumstance. The Postal Service asserts the Commission incorrectly imposed a "strict 'nexus' or offset test," requiring that the proposed adjustments mirror the amount of revenue the Postal Service can demonstrate was lost solely "due to" the recession and its effect on mail volume, dollar-for-dollar. Pet'r's Br. 3-5. Indeed, the Commission seems to have required a very close match, expecting the Postal Service to "show that its proposed rate adjustments are tailored to offset the specific effects of the claimed exigency." Exigent Request Denial at 65; *see also id.* at 60-61 ("[I]t is incumbent on the Postal Service to demonstrate how the *specific* rate increases it proposes flow from the *particular* circumstances that it cites as exceptional." (emphases added)). The statute itself, however, is mute on how close the match must be. In particular, the "due to" phrase itself is not

determinative on this issue because, although it has a plain meaning regarding causal connection *vel non*, as we concluded *supra*, it has no similar plain meaning regarding the closeness of the causal connection. In the latter sense,

> [t]he phrase "due to" is ambiguous. "The words do not speak clearly and unambiguously for themselves. The causal nexus of 'due to' has been given a broad variety of meanings in the law ranging from sole and proximate cause at one end of the spectrum to contributing cause at the other."

*Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1100 (10th Cir. 1999) (quoting *Adams v. Director, OWCP*, 886 F.2d 818, 821 (6th Cir. 1989)).[5] In other words, the phrase can mean "due *in part* to" as well as "due *only* to." A financial crisis can often result from multiple contributing factors, of which only one may be "extraordinary or exceptional." It would not be incorrect to say that the requested rate increase is "due to" the extraordinary factor simply because it is also "due to" other factors as well.[6] The statute on its face does not make clear which meaning of "due to" the Congress intended. The Commission therefore could not properly reject the proposed adjustments at *Chevron* step 1. Instead, as the agency charged with implementing section 201(d)(1)(E), the Commission was bound to proceed to

---

[5]*See Adams*, 886 F.2d at 821 (interpreting term "due to pneumoconiosis" in Black Lung Benefits Act to require claimant to "establish only that his totally disabling respiratory impairment . . . was due 'at least in part' to his pneumoconiosis" and rejecting proposed causation standard that would have required proof that pneumoconiosis 'in and of itself' caused totally disabling condition).

[6]That said, given the posture of this case, we have no need to decide here whether an increase might be so disproportionate to the exigency's impact on the Postal Service that it could not be considered "due to" that exigency.

*Chevron* step 2 to fill the statutory gap by determining how closely the amount of the adjustments must match the amount of the revenue lost as a result of the exigent circumstances. Because the Commission did not proceed to step 2, we remand for it to do so now. *See Peter Pan Bus Lines, Inc*, 471 F.3d at 1354.

For the foregoing reasons, we deny the Postal Service's petition in part, upholding the Commission's *Chevron* step 1 interpretation of the plain meaning of "due to" in PAEA section 201(d) as requiring a causal connection between the exigent circumstances and the proposed rate adjustments. We also grant the petition in part, rejecting the Commission's *Chevron* step 1 interpretation of "due to" as requiring that the Postal Service match the amount of the proposed adjustments *precisely* to the amount of revenue lost as a result of the exigent circumstances. Accordingly, we remand to the Commission to address the latter issue at *Chevron* step 2.

*So ordered*.