# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 19, 2013        Decided November 15, 2013

No. 12-1367

NEWSPAPER ASSOCIATION OF AMERICA,
PETITIONER

v.

POSTAL REGULATORY COMMISSION,
RESPONDENT

NATIONAL NEWSPAPER ASSOCIATION, INC., ET AL.,
INTERVENORS

On Petition for Review of an Order
of the Postal Regulatory Commission

*Robert A. Long Jr.* argued the cause for petitioner Newspaper Association of America. With him on the briefs were *Mark W. Mosier* and *Matthew J. Berns*. *Kurt A. Wimmer* entered an appearance.

*Steven C. Douse* argued the cause for intervenors National Newspaper Association, Inc. et al. in support of petitioner. With him on the briefs were *William J. Olson*, *Herbert W. Titus*, *John S. Miles,* and *Tonda F. Rush.*

*Barbara Camens* was on the brief for *amicus curiae* Newspaper Guild-CWA in support of petitioner Newspaper Association of America.

*Jeffrey Clair*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Michael S. Raab*, Attorney, *Stephen L. Sharfman*, General Counsel, Postal Regulatory Commission, and *R. Brian Corcoran*, Deputy General Counsel.

*Morgan E. Rehrig*, Attorney, United States Postal Service, argued the cause for intervenors United States Postal Service, et al. in support of respondent. With her on the brief were *Stephan J. Boardman* and *Thomas W. McLaughlin*.

Before: HENDERSON and GRIFFITH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: In August 2012, the Postal Regulatory Commission issued an order approving a negotiated service agreement for the sale of postage between the United States Postal Service and Valassis Direct Mail, Inc., a national marketing company. Under the agreement, Valassis receives discounted postage for some of its advertisement mailers once its mail volume hits a predetermined threshold. Petitioner Newspaper Association of America, with the support of three intervenors, challenges the Commission's order approving the deal.

3

I

The Postal Service is empowered to set "reasonable and equitable" postal "rates" subject to the approval of the Postal Regulatory Commission. *See* 39 U.S.C. §§ 404(b), 3622(a), (d)(1). "Rates" include not only those for the familiar first-class and priority mail, but also "negotiated service agreements," that is, contracts between the Postal Service and individual mailers for customized—and generally discounted—rates of postage. *See* 39 C.F.R. §§ 3001.5(r), 3010.6.

The statutory system governing rates depends on whether the rate is for a "market-dominant" or a "competitive" service. 39 U.S.C. § 3642(b). A service is "market-dominant" if either (1) the Postal Service has achieved a level of market power in providing that service that would allow it to raise prices without losing "a significant level of business," *id.* § 3642(b)(1), or (2) it is a service covered by the statutory postal monopoly, *id.* § 3642(b)(2). Because the negotiated service agreement in this case is for the purchase of standard mail products, it is subject to the postal monopoly, *see* 18 U.S.C. § 1696(a); 39 C.F.R. § 310.2(a), and thus the rules governing rates for market-dominant products apply.

In reviewing rates for market-dominant products, the Commission must consider the statutory factors set out in 39 U.S.C. § 3622(c). That subsection establishes rate requirements for all market-dominant products, *see id.* § 3622(c)(1)–(9) & (11)–(14), as well as particular requirements for negotiated agreements, *see id.* § 3622(c)(10).

As relevant here, a negotiated service agreement must meet the following requirements: (1) it must improve the net financial position of the Postal Service, *id.* § 3622(c)(10)(A)(i); (2) it may not cause "unreasonable harm to the marketplace," *id.*

§ 3622(c)(10)(B); (3) it must be "available on public and reasonable terms to similarly situated mailers," *id.* § 3622(c)(10); (4) it must comport with "the policies of [Title 39]," *id.*; and (5) the Commission, before approving the agreement, must give "due regard" to its impact on "small business concerns," *id.* § 3642(b)(3)(C).[1]

Once the Postal Service has negotiated terms with a particular mailer, it must notify the public and the Commission of its intention to implement a rate adjustment. 39 C.F.R. § 3010.41. The Commission then initiates proceedings to determine whether the agreement complies with the statutory requirements. *Id.* § 3010.44. Comments from the Postal Service, its partner in the deal, and the public are welcome. *See id.* If the agreement is lawful, the Commission issues an order and the agreement may take effect. *Id.*

The Postal Service proposed the negotiated service agreement in this case in April 2012, and the public proceeding commenced that May. The structure of the Agreement is fairly simple. For three years, Valassis agrees to maintain its current levels of "standard mail saturation flats"—that is, advertising circulars delivered to at least 75 percent of potential addresses on a standard mail carrier route. In return, the Postal Service offers Valassis a discount on new mailing programs of that same type initiated in excess of current levels. The discount is limited in a few ways. It applies only to mailings carrying advertisements for retailers that deal in durable and semi-durable goods and that have a physical retail presence in 30 or more states. It also applies only to new mailing programs initiated in markets in which Valassis has an *existing* program. And the discount on that new program remains in force only if

---

[1] Additional statutory requirements not relevant here apply to the setting of all rates. *See, e.g.*, 39 U.S.C. §§ 403(c), 404a(a)(1).

the corresponding existing program continues to operate at or above current levels.

The Commission received dozens of submissions from, among others, individual newspapers, two U.S. Senators, petitioner Newspaper Association of America, intervenor National Newspaper Association, and intervenors Valpak Direct Marketing Systems and Valpak Dealers Association (collectively, "Valpak"). The comments were overwhelmingly against the Agreement and, taken together, argued that the Agreement failed to satisfy any of the statutory criteria discussed above. The Commission disagreed and issued its final order approving the Agreement on August 23, 2012.[2] It denied a motion to stay the order one week later. This petition for judicial review followed.

II

Intervenors Valpak and the National Newspaper Association argue that the Agreement was not properly before the Commission because the Governors of the Postal System never approved it. This, they say, rendered the Commission's order void.

Establishing new rates, which includes proposing negotiated service agreements, is the job of the Governors of the Postal Service. 39 U.S.C. § 404(b). The Governors are appointed by the President, confirmed by the Senate, and constitute nine of the eleven members of the "Board of Governors." *Id.* § 202. The Board of Governors comprises the nine Governors *plus* the

---

[2] For the full order, see Valassis Direct Mail, Inc., Dkt. MC2012-14 (Postal Regulatory Comm'n Aug. 23, 2012) (order), *available at* http://www.prc.gov/Docs/85/85014/Order_No_1448.pdf.

Postmaster General and the Deputy Postmaster General.[3]  And the two bodies—the nine Governors as distinguished from the full Board—have independent statutory responsibilities.  While the Board exercises the general "power of the Postal Service,"[4] 39 U.S.C. § 202(a)(1), only the Governors are specifically authorized to "establish . . . equitable rates of postage."  *Id.* § 404(b).

"Except for those powers, duties, or obligations specifically vested in the Governors, as distinguished from the Board of Governors, the Board may delegate the authority vested in it . . .."  *Id.* § 402.  In other words, while the Board may delegate its duties, the Governors may not.  And since "rates of postage" includes negotiated service agreements, § 402 means that the Governors cannot delegate the job of executing such agreements and bringing them before the Commission—which is what the intervenors claim the Governors did here.

The intervenors' claim rests on the Governors' Resolution 11-4, signed in March 2011.  The Resolution authorizes Postal Service "management" to negotiate service agreements with postal customers and propose those agreements to the Postal Regulatory Commission.  The Resolution declares all rates proposed under it "hereby established" in advance, provided the rates comply with the statutory requirements—and the

---

[3] The Governors appoint the Postmaster General, 39 U.S.C. § 202(c), and the Governors together with the Postmaster General appoint the Deputy, *id.* § 202(d).  So the Postmaster General and his Deputy, although members of the Board of Governors, are not Governors.

[4] This power includes, among many other things, the power to establish post offices; investigate postal crimes; and prescribe the details of mail collection, handling, delivery, forwarding and returning.  *See* 39 U.S.C. § 404(a)(1)–(8).

Resolution instructs the Postal Service's chief financial officer to ensure that they do. Furthermore, it instructs management to provide the Governors with quarterly "report[s]" on new initiatives and to "furnish . . . information . . . regarding any significant, new program, policy, major modification, or initiative." On its face the Resolution does not seem to require the Governors to approve each new rate.

In April 2012, citing Resolution 11-4, Postal Service management submitted the Agreement to the Postal Regulatory Commission. In response, Valpak submitted comments to the Commission arguing that the Agreement was the result of an unlawful delegation by the Governors. It claimed that Resolution 11-4, by allowing Postal Service management to negotiate service agreements, delegates the Governors' statutory responsibility to set rates in violation of 39 U.S.C. § 402. Thus, according to Valpak, the Agreement was not properly before the Commission. The Postal Service replied that, notwithstanding Resolution 11-4, the Governors had in fact approved the Agreement before it was submitted. In this court, the intervenors once again raised the argument challenging Resolution 11-4, and the Postal Service reasserted that the Agreement had been pre-approved.

There is no reason for us to decide whether Resolution 11-4 unlawfully delegates authority to the Postal Service. According to the Postal Service, the Governors in fact reviewed and approved the Agreement before it was submitted to the Commission. That assertion was not challenged in the

administrative proceeding, and we understand the Commission to have accepted it as fact.[5]  The intervenors challenge it for the first time in their reply brief to this court, but we have repeatedly held that we do not consider arguments raised only in a reply brief.  *See Rollins Envtl. Servs. (NJ), Inc. v. EPA*, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991); *McBride v. Merrell Dow & Pharms., Inc.*, 800 F.2d 1208, 1210-11 (D.C. Cir. 1986).  We thus accept the Postal Service's assertion as true.

At oral argument, counsel for intervenors questioned whether pre-approval by the Governors was even enough—§ 402, counsel suggested, requires a more "formal" approval.  But this argument, made at that point for the first time, comes much too late.  *See United States v. Southerland*,

---

[5] We quote in substantial part the Commission's response to Valpak's delegation argument:

> The Postal Service responds by stating "the Governors did authorize the Postal Service to enter into this [Agreement] and reviewed the specific terms and prices that would be charged prior to filing the Notice."  Postal Service Comments at 19.  It correctly references Governors' Resolution No. 11-4 . . . which obviates the need for a separate specific authorization for every contract consistent with that resolution.

Valassis Direct Mail, Inc., Dkt. MC2012-14, at 9 n.14 (Postal Regulatory Comm'n Aug. 23, 2012) (order), *available at* http://www.prc.gov/Docs/85/85014/Order_No_1448.pdf.  The Commission's language is not a model of clarity, but it expresses no doubt about the veracity of the Postal Service's claim.  Acknowledging this uncontested fact suffced to allow the Commission to move past the delegation issue.  Whether the Commission also meant to pronounce on the validity of Resolution 11-4 is unclear.  We would have expected a much more thorough legal analysis had it intended to do so.

486 F.3d 1355, 1360 (D.C. Cir. 2007).  We therefore assume that the Governors' level of involvement in this case—approving the deal, if not actually submitting the paperwork—satisfies the requirements of § 402.  As a result, we need not consider whether Resolution 11-4 violates § 402.[6] *See Fried v. Hinson*, 78 F.3d 688, 692 (D.C. Cir. 1996).

We now proceed to the merits of the order.

## III

In approving the Agreement, the Commission concluded that the Agreement would not cause "unreasonable harm to the marketplace." *See* 39 U.S.C. § 3622(c)(10)(B).  To do so, the Commission first had to interpret that statutory phrase.  Typically, an administrative agency is entitled to a degree of deference in interpreting "the statute which it administers." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842 (1984).  But petitioner Newspaper Association of America argues that the meaning of "unreasonable harm to the marketplace" had been settled before 2006, that when Congress enacted the statute using this language it adopted the earlier interpretation, and that the Commission was not free to depart from that interpretation.

---

[6] Typically, we would first have considered whether the intervenors could raise this argument at all.  The rule in this circuit is that intervenors may not raise issues not already brought before the court by a petitioner.  *See New York v. Reilly*, 969 F.2d 1147, 1154 n.11 (D.C. Cir. 1992); *Ill. Bell Tel. Co. v. FCC*, 911 F.2d 776, 786 (D.C. Cir. 1990). *But see Synovus Fin. Corp. v. Bd. of Governors*, 952 F.2d 426, 433-34 (D.C. Cir. 1991) (describing that rule as "prudential" and subject to appropriate exceptions).  However, since we do not reach the merits of the intervenors' argument, we assume arguendo that the argument is properly before us.

To be more specific, before passage of the 2006 Act the Postal Rate Commission—the current Commission's predecessor—promulgated regulations governing negotiated service agreements. *See* Negotiated Service Agreements, 69 Fed. Reg. 7574 (Feb. 18, 2004) (codified at 39 C.F.R. subpt. L, later removed as obsolete). One of the regulations provided that negotiated service agreements were acceptable so long as they were "consistent with statutory criteria," "benefit[ted] the Postal Service," and did not cause "unreasonable harm to the marketplace." 39 C.F.R. § 3001.190(b) (2004). Another regulation required "an analysis of the impact" of such an agreement on competitors of the parties to the agreement. *Id.* § 3001.193(f)(1)(i). According to the Newspapers, the Postal Rate Commission understood § 3001.193(f)(1)(i)'s impact-analysis requirement to give content to § 3001.190(b)'s "unreasonable harm to the marketplace" standard. It follows, the Newspapers say, that Congress incorporated the definition of "unreasonable harm to the marketplace" in the 2006 Act as the regulations and decisions of the Postal Rate Commission had interpreted the phrase.[7]

The argument cannot survive close inspection. Its premise is incorrect. There is no reason to suppose that the Postal Rate Commission thought § 3001.193(f)(1)(i)'s direction to consider harm to competitors embodied a definition of § 3001.190(b)'s "unreasonable harm to the marketplace." Federal regulations, like federal statutes, may contain one provision that is meant to give more content to another. For instance, 39 C.F.R. § 3010.1, entitled "Definitions in this subpart," gives meaning to terms used in the postal regulations using the unmistakable language,

---

[7] Once the Act's statutory scheme replaced the existing regulatory scheme for governing negotiated service agreements, both regulations were "rendered obsolete" and removed. Updates to Rules of Practice, 74 Fed. Reg. 23,113 (May 18, 2009).

"Annual limitation means . . .." 39 C.F.R. § 3010.1(a); *see also, e.g.*, 8 C.F.R. § 1.2 ("Definitions"); 26 C.F.R. § 2.1–1 ("Definitions"). So when other regulations refer to "the annual limitation," § 3010.1(a)'s definition clearly applies. *See, e.g.*, 39 C.F.R. § 3010.4(a). Sections 3001.190(b) and 3001.193(f)(1)(i) were not of that sort. They simply co-existed, sections apart. And at the end of the day, Congress codified but one of them.

Postal Rate Commission precedents likewise contain nothing to indicate that "unreasonable harm to the marketplace" had become infused with the meaning the Newspapers detect. Early decisions of the Postal Rate Commission considered harm to competitors— § 3001.193(f)(1)(i) had required as much. But the Postal Rate Commission did not tie that inquiry to the "unreasonable harm" standard. *See, e.g.*, HSBC N. Am. Holdings Inc., Dkt. MC2005-2, at 37 (Postal Rate Comm'n May 20, 2005) (op. and recommended decision), *available at* http://www.prc.gov/Docs/44/44289/OpinionMC2005-2Final.pdf; Bank One Corp., Dkt. MC2004-3, at 17 (Postal Rate Comm'n Apr. 21, 2006) (op. and recommended decision), *available at* http://www.prc.gov/Docs/48/48385/DecisionMC2004-3Final.pdf. The current Commission's other post-Act negotiated service agreement proceeding considered the newly codified "unreasonable harm to the marketplace" factor but provided no content to it because there was no dispute about its meaning. *See* Discover Fin. Servs., Dkt. MC2011-19, at 21 (Postal Regulatory Comm'n Mar. 15, 2011) (order), *available at* http://www.prc.gov/Docs/72/72262/Order_No_694.pdf.

In this case the Commission was thus interpreting "unreasonable harm to the marketplace" for the first time. And because "unreasonable" is an amorphous term, we must give the nod to the agency in determining its meaning, so long as that meaning is rational and one the statutory language can bear.

*See, e.g.*, *Capital Network Sys., Inc. v. FCC*, 28 F.3d 201, 204 (D.C. Cir. 1994). That test is satisfied here.

The Commission looked to antitrust law and concluded that harm to the marketplace was "unreasonable" only if it was the result of anticompetitive pricing—that is, pricing below cost. The Commission decided further that it was not obligated to protect individual competitors of the parties to the Agreement from the harms of fair competition. To the Commission, "as long as the Postal Service is not pricing its products below costs to drive its competitors out of the business, it is not creating an unreasonable level of harm in the marketplace." Valassis Direct Mail, Inc., Dkt. MC2012-14, at 27 (Postal Regulatory Comm'n Aug. 23, 2012) (order) [hereinafter "Valassis Order"], *available at* http://www.prc.gov/Docs/85/85014/Order_No_1448.pdf. Since the terms of the Agreement price all postage above cost, the Commission did not find the rates to be anticompetitive and therefore concluded that the Agreement was not unreasonably harmful to the marketplace.

In giving content to ambiguous statutory phrases, an administrative agency is at liberty to look to other bodies of law, such as antitrust. *See N. Natural Gas Co. v. Fed. Power Comm'n*, 399 F.2d 953, 961 (D.C. Cir. 1968). Here, the Commission drew on a basic tenet of antitrust law: fair competition is good for consumers even when it leads to "injury inflicted upon rivals." ROBERT H. BORK, THE ANTITRUST PARADOX 136-44 (1978). The Newspapers say the Commission's antitrust analysis was "cramped." Pet'r Br. 35. They correctly remind us that, generally speaking, predatory pricing is just one of many ways to cause harm in a marketplace. But here it was precisely the "aggressive price reductions" for Valassis that the Newspapers found objectionable. Opp'n of Newspaper Ass'n of Am., Valassis NSA, Dkt. MC2012-14, at 3 (Postal Regulatory Comm'n May 23, 2012). It was sensible

for the Commission to address itself to potential anticompetitive harms risked by that specific aspect of the deal. The question whether "unreasonable harm to the marketplace" under § 3622(c)(10)(B) encompasses other anticompetitive tactics is not now before us.

In any event, in looking to the antitrust laws to inform its own statutory interpretation, the Commission is not "strictly bound by the dictates of th[o]se laws." *N. Natural Gas Co.*, 399 F.2d at 961. Rather, the nature of the agency's interpretive discretion is that it may employ those concepts "to a greater or lesser degree" in order to set sound policy. *Id.*

Agency policy judgments still must be adequately explained. *See* 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). On that score, the Newspapers argue that the Commission's application of the "unreasonable harm to the marketplace" standard was arbitrary and capricious.

They cite Professor John Panzar, an economist who, in prepared testimony in 2003, advised the old Postal Rate Commission on how to regulate negotiated service agreements. Professor Panzar believed that the concerns of "[c]ompetitors of the Postal Service" should not be considered in evaluating a negotiated service agreement, so long as the Postal Service's pricing was not anticompetitive. Official Transcript of Postal Rate Commission at 1637, Capital One Servs., Inc., Dkt. MC2002-2 (Feb. 7, 2003), *available at* http://www.prc.gov/Docs/37/37064/08-02-0703.pdf. But Professor Panzar also advised that "[c]ompetitors of the firm *receiving* the [negotiated service agreement] . . . may be adversely affected" and that "their concerns are an important part of the evaluation process." *Id.* at 1595 (emphasis added). The Commission cited Professor Panzar in its analysis of the term "unreasonable harm to the

marketplace" but declined to analyze the Agreement's effects on anyone other than the Postal Service's competitors. The Newspapers challenge what they perceive as a misguided application of Professor Panzar's approach.[8]

The Newspapers are correct that the Commission did not meaningfully consider the impact the Agreement would have on Valassis's competitors. But we do not believe this diversion from Professor Panzar was arbitrary and capricious. The Commission derived its primary rationale for interpreting "unreasonable harm" from antitrust law. It said as much and cited two Supreme Court cases for support. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The [antitrust] law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."); *Brown Shoe Co. v. United States*, 370 U.S. 294, 344 (1962) ("It is competition, not competitors, which the [Sherman] Act protects."). On that basis, the Commission interpreted "unreasonable harm" to mean anticompetitive behavior. And under that interpretation, the

---

[8] The intervenors (and the Newspapers to a certain extent) also make the point that newspapers can themselves be considered competitors of either the Postal Service or Valassis. They compete with the Postal Service in the market to deliver advertisements to consumers, and they compete with Valassis in the market to sell space in which to place an advertisement. So had the Commission, as Professor Panzar suggested, concerned itself with the Agreement's effects on Valassis's, but not the Service's, competitors, it would first have had to justify placing newspapers in one group or the other. However, since we conclude that the standard the Commission chose did not require a consideration of the Agreement's effects on either group, the point is of little importance here.

Agreement was lawful because the postage was priced above cost.[9]

The Commission cited Professor Panzar for additional support, but it did not entirely embrace his testimony. We do not think an agency decision can rise or fall with its faithfulness to every authority it cites but does not entirely rely upon. *See Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 954 (D.C. Cir. 2007). Here, the Commission relied on antitrust law and, on that basis, rationally explained the interpretation it applied.[10]

The Commission also concluded that, as the statute required, the Agreement would result in a net benefit to the Postal Service. *See* 39 U.S.C. § 3622(c)(10)(A). The Commission first explained that the Agreement's discounts apply only to postage purchased in excess of Valassis's current mailing volumes. In that way, the Agreement was specifically designed to offer discounted postage for "volumes generated in response to the discount" and not for "volume that would have been mailed" anyway. Valassis Order 17.

---

[9] The price of the postage confirms only that the Postal Service was not employing anticompetitive tactics; it says nothing about Valassis. But the Newspapers do not accuse Valassis of unfair competition. And counsel for the Commission confirmed at oral argument that if Valassis were to engage in predatory pricing (or any other anticompetitive tactic) on the strength of its favorable postal rates, standard antitrust remedies would be available.

[10] In addition, the Commission noted that any competitive advantage conferred upon Valassis by the Agreement would be dulled by the statutory requirement that the benefits of the deal be made available "on public and reasonable terms to similarly situated mailers." 39 U.S.C. § 3622(c)(10).

The Newspapers accept this logic. But they claim that gains from Valassis's expenditures will be more than offset by reduced postage expenditures by mailers not party to the Agreement. *See* 39 C.F.R. § 3010.42(f)(3) (requiring the Commission to consider this effect). They argue that if Valassis can send advertising through the mail more cheaply, then it can charge less to its advertisers and thereby cause its competitors (chiefly, newspapers) to lose market share. Less market share means less mail to send and less money spent on postage. The Newspapers estimated that this effect would lead newspapers to reduce postage expenditures by $199 million annually over the three-year life of the Agreement. The Commission found that projection to be unsupported.

When, as here, an agency is making "predictive judgments about the likely economic effects of a rule," we are particularly loath to second-guess its analysis. *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 541 (D.C. Cir. 2009). Such calculations fall "squarely within the ambit of [the Commission's] expertise." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 9 (D.C. Cir. 2006) (internal quotation marks omitted); *see* 39 U.S.C. § 3622. Our narrow task here is to ensure that the Commission sufficiently supported its analysis. *See Nat'l Tel. Coop. Ass'n*, 563 F.3d at 540-41. We believe it did.

The Commission identified limitations on the accuracy of the newspapers' projections. Primarily, given newspapers' recent financial struggles, *see* Nick Gamse, Note, *Legal Remedies for Saving Public Interest Journalism in America*, 105 Nw. U. L. Rev. 329, 331-33 (2011), it is difficult to attribute a drop in postage expenditures to one particular pricing arrangement. As the Commission observed, the individual newspapers that submitted comments to the Commission seemed to ignore that complexity. Many papers projected, with little support, only the very worst case—that approval of the

Agreement would cause them to reduce their postage expenditures to, or near, zero. Given the Commission's explanation of the complexities involved in making these projections, we cannot disturb its finding that the projections here were too speculative to be useful.

The Commission was also required to consider "the policies of [Title 39]" in assessing the Agreement. 39 U.S.C. § 3622(c)(10), (14). (Title 39 of the U.S. Code contains federal postal law.) The Newspapers contend again, now under this provision, that the Commission failed to consider the impact of the Agreement on newspapers' survival in the marketplace. For much of our nation's history, postal policy has subsidized the mailing of newspapers in recognition of the virtues of a well-informed electorate. *See* Note, *Second-Class Postal Rates and the First Amendment*, 28 RUTGERS L. REV. 693, 695-96 & n.14 (1975). It is a small jump to conclude that a postal rate that potentially harms newspapers as a business might run counter to those policies.

But the 2006 Postal Accountability and Enhancement Act considerably revised Title 39 with an eye toward ensuring the Postal Service's financial viability. *See* S. REP. NO. 108-318, at 2-4 (2004). Now, Title 39 reflects the Postal Service's need to increase revenue through negotiated service agreements. According to the Commission, Title 39 does not include a policy of protecting newspapers "from the consequences of fair competition." Valassis Order 33. In light of the 2006 revisions to the Act, we see no basis for disagreeing with the Commission's conclusion. *Cf. U.S. Postal Serv. v. Postal Regulatory Comm'n*, 676 F.3d 1105, 1108 (D.C. Cir. 2012).

We also believe that the Commission gave "due regard" to the Agreement's impact on small business concerns. *See* 39 U.S.C. § 3642(b)(3)(C). By its terms, this provision does not

impose a substantive limitation on the Commission's decisionmaking. It requires only that the decision "address certain legally delineated topics." *Nat'l Tel. Coop. Ass'n*, 563 F.3d at 540. Here, the Commission concluded that the Agreement's impact on small business would be cabined because of geographic and advertising limitations built into the Agreement. That analysis considers the issue sufficiently and constitutes the requisite "due regard."[11]

## IV

The Commission's order complies with the Postal Accountability and Enhancement Act and the Administrative Procedure Act. We have considered and rejected the other arguments made against the Commission's order. We therefore deny the petition for review.

*So ordered.*

---

[11] Only intervenors raised this argument. However, because we would reject it in any event, we assume arguendo that we may consider it.