# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 13, 2021       Decided November 12, 2021

No. 17-1276

NATIONAL POSTAL POLICY COUNCIL,
PETITIONER

v.

POSTAL REGULATORY COMMISSION,
RESPONDENT

NATIONAL NEWSPAPER ASSOCIATION, ET AL.,
INTERVENORS

———

Consolidated with 20-1505, 20-1510, 20-1521

———

On Petitions for Review of Orders
of the Postal Regulatory Commission

———

*Ayesha N. Khan* argued the cause for Mailer petitioners. With her on the briefs were *William B. Baker, Eric S. Berman, Matthew D. Field, Ian D. Volner,* and *Elizabeth C. Rinehart.*

*David C. Belt*, Attorney, U.S. Postal Service, argued the cause for petitioner United States Postal Service. With him on the briefs was *Morgan E. Rehrig,* Attorney. *Stephen J. Boardman,* Chief Counsel, entered an appearance.

*Dana Kaersvang,* Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were *Brian M. Boynton*, Acting Assistant Attorney General, and *Michael S. Raab* and *Michael Shih*, Attorneys, *David A. Trissell,* General Counsel, United States Postal Regulatory Commission, *Christopher Laver*, Deputy General Counsel, and *Anne J. Siarnacki* and *Reese T. Boone*, Attorneys.

*Morgan E. Rehrig* and *David C. Belt*, Attorneys, United States Postal Service, were on the brief for intervenor United States Postal Service in support of respondent.

*William B. Baker, Ayesha N. Khan, Eric S. Berman, Matthew D. Field, Ian D. Volner,* and *Elizabeth C. Rinehart* were on the brief for intervenors Alliance of Nonprofit Mailers, *et al*. in support of respondent. *David M. Levy* entered an appearance.

Before: ROGERS and TATEL, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: In 2006, Congress passed the Postal Accountability and Enhancement Act, which directed the Postal Regulatory Commission to establish a ratemaking system to govern the prices set by the U.S. Postal Service for its market-dominant products. Although Congress left many details to the Commission, it forbid rates from increasing faster than the rate of inflation. The Commission was also required to assess after ten years whether the system had achieved nine objectives. If not, then the Commission could modify the ratemaking system or adopt an alternative one. This case arises from that mandatory ten-year review. In 2017, the Commission found that the existing ratemaking system was

deficient and had not maintained the Postal Service's financial stability. After extensive review, it adopted a new system in 2020, which retains the price cap generally but allows above-inflation rate increases to target specific costs. *Order 5763: Order Adopting Final Rules for the System of Regulating Rates and Classes for Market Dominant Products*, Docket No. RM2017-3 (P.R.C. Nov. 30, 2020), 85 Fed. Reg. 81,124 (Dec. 15, 2020) ("*Order 5763*").

Groups whose members purchase postal products ("Mailers") and the Postal Service seek review of the Commission's new ratemaking system. The Mailers oppose any new rate authority. They contend that the system is inconsistent with the statute that gives the Commission its regulatory authority and is arbitrary and capricious. In contrast, the Postal Service contends that the Commission's new ratemaking system is irrational because it does not confer enough rate authority. The Commission responds that its actions are authorized by statute and reasonably explained.

For the following reasons, the court concludes that the Commission acted within its authority under the Accountability Act, and that its predictive judgments and economic conclusions satisfy the Administrative Procedure Act's requirement of reasoned decision-making. Accordingly, the court denies the petitions for review.

**I.**

By way of introduction, a summary of the Accountability Act is followed by a summary of the proceedings before the Commission.

4

**A.**

For much of the Nation's history, postal services were administered by the Post Office Department at rates fixed by Congress. *See Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*, 462 U.S. 810, 813 (1983) ("*Greeting Card Publishers*"). In 1970, Congress relinquished control of ratesetting and replaced the Post Office Department with two independent executive agencies: the United States Postal Service and the Postal Rate Commission. *See* Postal Reorganization Act of 1970, Pub. L. No. 91-375, §§ 201–02, 3601, 84 Stat. 719, 720, 759. Superintended by a Board of Governors, consisting of experts in economics, accounting, law, and public administration, 39 U.S.C. § 502(a), the Postal Service was required to set rates equal to costs with the goal of breaking even. *See Greeting Card Publishers*, 462 U.S. at 813. To guide the Postal Service, Congress charged the Postal Rate Commission (later renamed the Postal Regulatory Commission) with reviewing the Board's rate proposals. *See id.* at 813–14.

In 2006, Congress modernized the Postal Service in the Postal Accountability and Enhancement Act ("Accountability Act" or "Act"), Pub. L. No. 109-435, 120 Stat. 3198 (2006). Section 201 of the Act, 39 U.S.C. § 3622, "completely reformed the ratemaking system for market-dominant products," *i.e.*, those "products for which the Postal Service enjoys a statutory monopoly, or for which the Postal Service exercises sufficient market power so that it can effectively dictate the price of such products without risk of losing much business to competing firms." *U.S. Postal Serv. v. Postal Regul. Comm'n*, 785 F.3d 740, 744 (D.C. Cir. 2015) (citing 39 U.S.C. § 3642(b)(1)–(2)). The Act required the Commission to "establish" within eighteen months "a modern system for regulating rates and classes for market-dominant products." 39

U.S.C. § 3622(a). The system had to "be designed to achieve [nine] objectives, each of which shall be applied in conjunction with the others," *id.* § 3622(b), taking fourteen "[f]actors" into account, *id.* § 3622(c). The Act further enumerates five "[r]equirements" that the ratemaking system "shall" contain. *Id.* § 3622(d).

Pertinent here, the Act mandates that the ratemaking system "include an annual limitation on the percentage changes in rates . . . equal to the change in the Consumer Price Index." *Id.* § 3622(d)(1)(A). This prevents rates for market-dominant products from rising faster than the inflation rate. *See U.S. Postal Serv.*, 785 F.3d at 744. The hope was that moving from a cost-of-service model to a price cap would incentivize the Postal Service to cut costs and improve efficiency. *See* S. Comm. on Gov't Affairs, Postal Accountability and Enhancement Act, S. REP. 108-318, at 9 (2004). The Postal Service may exceed the price cap if the Commission finds, after notice and comment, that a rate change is warranted due to "extraordinary or exceptional circumstances" if "reasonable and equitable and necessary" to maintain postal services. 39 U.S.C. § 3622(d)(1)(E).

The Accountability Act provides the Commission two ways to change the ratemaking system. First, the Commission may "revise" the system "from time to time." *Id.* § 3622(a). Second, the Commission must assess ten years after the Act's passage "if the system is achieving the objectives in subsection (b), taking into account the factors in subsection (c)." *Id.* § 3622(d)(3). "If the Commission determines, after notice and opportunity for public comment, that the system is not achieving the objectives," then it "may, by regulation, make such modification or adopt such alternative system for regulating rates . . . as necessary to achieve the objectives." *Id.*

**B.**

In December 2017, the Commission released the findings of its ten-year review. *Order 4257*, Docket No. RM2017-3 (P.R.C. Dec. 1, 2017). It found that "while some aspects of the system" had "worked as planned, overall[] the system has not achieved the [Act's] objectives." *Id.* at 5. The Commission explained that the "operating environment" of the Postal Service "changed quickly and dramatically" after the Act's passage. *Id.* at 45. The "Great Recession" of 2008 resulted in the most severe decline in mail volumes since the Great Depression of the 1930s, causing the Postal Service's revenue to plummet. *Id.* at 38. The period of deflation after the Great Recession meant the Postal Service could not increase rates due to the statutory price cap. *Id.* Throughout, the Postal Service's costs soared due to an obligation imposed on it by the Accountability Act requiring the prefunding of retirement benefits. *Id.* at 37. As a result, the Postal Service accumulated a $59.1 billion deficit in just ten years. *Id.* at 171.

Given those findings, the Commission determined that the existing ratemaking system failed to achieve three statutory objectives. First, the system had not maintained the financial stability of the Postal Service. *Id.* at 178. Although the Postal Service could cover its immediate operating expenses, *id.* at 159–65, it had not achieved "medium-term stability" as it had suffered a net loss for ten straight years, *id.* at 165–69. Nor had the Postal Service achieved "long-term stability" because it lacked the funds to invest in capital improvements or pay down debts. *Id.* at 169–71. Second, the system had not maximized incentives to cut costs and improve efficiency. *Id.* at 226. Despite the Postal Service having reduced costs, *id.* at 191, and improved its efficiency, *id.* at 203–21, the ratemaking system did not maximally incentivize such efforts because they "were insufficient to address the Postal Service's financial

instability," *id.* at 222. Third, the system had not achieved reasonable rates "because certain products and [mail] classes threatened the financial integrity of the Postal Service." *Id.* at 236.

Concurrent with its findings, the Commission proposed "a two-pronged solution designed to place the Postal Service on the path to financial stability by providing [it] rate adjustment authority in addition to the CPI-U rate authority." *Order 4258*, Docket No. RM2017-3, at 37 (P.R.C. Dec. 1, 2017). To address medium-term financial stability, the Commission proposed authorizing the Postal Service to raise rates annually by an additional 2% per mail class for five years. *Id.* at 45. This would "put the Postal Service on the path to medium-term financial stability by providing [it] the opportunity to generate additional revenue to cover its obligations." *Id.* at 38. As for long-term financial stability, the Commission proposed a performance-based rate authority, which conditioned a 1% annual rate increase on hitting various benchmarks. *Id.* at 39. In addition to these rate authorities, the Commission also proposed mandating rate increases for mail products whose costs exceeded revenue. *Id.* at 77–78.

In response to comments, the Commission issued a revised ratemaking proposal in December 2019. *Order 5337*, Docket No. RM2017-3 (P.R.C. Dec. 5, 2019). In place of an across-the-board annual rate increase, the Commission proposed two rate authorities targeted to "costs that are outside of the Postal Service's control": declines in mail density and statutorily mandated retirement payments. *Id.* at 12. First, the Commission found that decreases in mail volume in concert with the Postal Service's statutory obligation to service every address had resulted in a decline in mail density, *i.e.*, the ratio of mail pieces to delivery points. *Id.* at 70. This, in turn, raises the cost of delivering each piece of mail. To account for these

costs, the Commission proposed allowing the Postal Service to raise rates annually by the amount by which per-unit costs are expected to increase based on the change in mail density in the prior year. *Id.* at 77. Second, the Commission found that "congressionally mandated [retirement] payments are outside of the Postal Service's direct control" but "continue to be one of the primary drivers of net loss." *Id.* at 90. The Commission proposed allowing the Postal Service to raise rates annually by the amount necessary for revenues to cover these payments. *Id.* at 91–92. According to the Commission, its modified proposal was "intended to go beyond the initial supplemental rate authority's goal of placing the Postal Service on the path to medium-term financial stability by providing the mechanisms necessary for the system to adjust appropriately to changes in the operating environment that are driving the Postal Service's net losses." *Id.* at 13.

In *Order 5763*, issued in November 2020, the Commission adopted this new ratemaking system with minor adjustments. As an initial matter, the Commission rejected the Mailers' argument that it had to reopen the record to examine the impact of the COVID-19 pandemic on the Postal Service, reasoning that "nothing specific to the pandemic undermines the findings [it] made in Order No. 4257." *Id.* at 26. In the new ratemaking system, the Commission adopted the density-based and retirement-based rate authorities, concluding that they were "necessary to achieve the objectives of [39 U.S.C. § 3622(b)], in conjunction with each other" and "focused on vital near-term improvements." *Id.* at 298. The Commission withdrew the proposed performance-based rate authority but adopted the rate increases for non-compensatory mail products. *Id.* at 21–22. The Commission stated that it would review the new system in five years, or sooner if necessary. *Id.* at 23, 267.

The Mailers and the Postal Service petitioned for review of *Order 5763*. The Mailers unsuccessfully petitioned for stays by the Commission and by the court. *See* D.C. Cir. Order, Doc. No. 1887800 (Mar. 1, 2021); *Order 5818*, Docket No. RM2017-3 (P.R.C. Jan. 19, 2021). In July 2021, the Commission approved a proposal of the Postal Service to increase rates for market-dominant products. *See Order 5937*, Docket No. R2021-2 (P.R.C. July 19, 2021). The Mailers again unsuccessfully petitioned for a stay by the court. *See* D.C. Cir. Order, Doc. No. 1911271 (Aug. 24, 2021). The new prices took effect on August 29, 2021. *Order 5937.*

## II.

The Mailers contend that *Order 5763* exceeded the Commission's statutory authority and is arbitrary and capricious.

## A.

First, the Mailers maintain that the Commission exceeded its statutory authority in allowing the Postal Service to raise rates in excess of inflation because § 3622 unambiguously forecloses the Commission from altering the price cap. Mailers Br. 19–24. Even were the Act susceptible to multiple interpretations, the Mailers maintain that the new ratemaking system is "irreconcilable with the Commission's prior understanding of the price cap" and is thus unreasonable. *Id.* at 25. Finally, the Mailers maintain that the constitutional avoidance canon counsels against the Commission's interpretation because § 3622(d)(3) is otherwise an unconstitutionally standardless delegation of authority. *Id.* at 26–30.

Under the two-step framework in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), the court first deploys the "traditional tools of statutory construction" to determine "whether Congress has directly spoken to the precise question at issue." *Id*. at 842–43 & n.9. If so, the court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843. If, however, "the statute is silent or ambiguous with respect to the specific issue," the court will defer to the Commission's interpretation if it is "a permissible construction of the statute." *Id*.; *see United Parcel Serv. v. Postal Regul. Comm'n*, 890 F.3d 1053, 1061–62 (D.C. Cir. 2018).

Consequently, the court "begin[s] with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (citation omitted). Subsection 3622(d)(3) provides:

> Ten years after the date of enactment of the Postal Accountability and Enhancement Act and as appropriate thereafter, the Commission shall review the system for regulating rates and classes for market-dominant products established under this section to determine if the system is achieving the objectives in subsection (b), taking into account the factors in subsection (c). If the Commission determines, after notice and opportunity for public comment, that the system is not achieving the objectives in subsection (b), taking into account the factors in subsection (c), *the Commission may, by regulation, make such modification or adopt such alternative system* for regulating rates and classes for market-dominant products as necessary to achieve the objectives.

39 U.S.C. § 3622(d)(3) (emphasis added).

The plain text contemplates two types of change: the Commission can "make [] modification[s]" to the ratemaking system or it can "adopt [an] alternative system." The word "modification" means to make a "limited change in something." *Modification*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/modification. In contrast, "alternative," when used as a noun, describes a "situation offering a choice between two or more things only one of which may be chosen." *Alternative*, Merriam-Webster.com, https://www.merriam-webster.com /dictionary/alternative. By its plain terms, then, the provision permits the Commission to either make minor changes to the ratemaking system or replace it altogether.

The Mailers do not contest this interpretation. Instead, they argue that the alternative ratemaking system adopted under § 3622(d)(3) must incorporate the price cap. They submit that § 3622(d)(1) precludes the Commission from altering the price cap because it is a "[r]equirement[]" that the "system for regulating rates and classes for market dominant products *shall*[] include." Mailers Br. 19–20. But "[a] standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007). In § 3622(a) and (d)(1)(A), "system" refers broadly to a scheme for "regulating rates and classes for market-dominant products," not to the subset of schemes that comply with the price cap. Therefore, absent evidence that Congress had a contrary intent, "system" most logically means the same in § 3622(d)(3), and includes rules that do not comply with the price cap.

The Mailers further contend that because § 3622(d)(3) permits the Commission to review the system "established under" § 3622, any alternate system adopted must also comply with all of § 3622's requirements. Their conclusion does not follow. Whatever meaning the Mailers give to the word "under," the phrase "established under" modifies only the system the Commission may review, not the alternative system it may adopt. Congress knew how to limit the Commission's authority following the ten-year review and yet declined to require it to maintain the rate cap. Subsection (d)(3) requires that any changes to the system be "necessary to achieve the objectives" in § 3622(b), but makes no mention of the rate cap.

The Mailers also invoke the presumption in *Russello v. United States* — that the inclusion of a phrase in one provision and its absence in another is deliberate, 464 U.S. 16, 23 (1983) — to argue that the exception to the price cap for emergencies in § 3622(d)(1)(E) demonstrates that Congress decided not to grant the Commission the authority to override the price cap in § 3622(d)(3). Mailers Br. 20–21. That canon has limited force here, however, because the two provisions use different words and are not otherwise parallel. *See City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 435–36 (2002). Section 3622(d)(1)(E) is only meaningful insofar as a price cap exists, so it is unsurprising that it references the cap.

The Mailers' narrow interpretation of § 3622(d)(3) would also render § 3622(a) superfluous. *See Mail Order Ass'n of Am. v. U.S. Postal Serv.*, 986 F.2d 509, 515 (D.C. Cir. 1993) (canon against surplusage). In addition to directing the Commission to "establish" a ratemaking system, § 3622(a) also provides that the Commission may "revise" the system "from time to time thereafter by regulation." 39 U.S.C. § 3622(a). The Mailers' interpretation of § 3622(d)(3) would render these words surplusage: if the price cap is an immutable feature of

the ratemaking system, then there is no meaningful difference between the Commission's authority to "revise" the ratemaking system and its authority to adopt an "alternative" ratemaking system after ten years. In contrast, the Commission's authority to revise the ratemaking system under § 3622(a) suggests that its authority following the ten-year review must be broader under § 3622(d)(3): the former allows the Commission to make modest changes to the ratemaking system at its discretion while the latter authorizes the Commission to replace the existing system if, after ten years, it concludes that the existing system has failed to achieve the Act's objectives. Broad authority under § 3622(d)(3) would be consistent with the more onerous procedural requirements imposed by that section, which requires notice and comment and a determination that the current system is not achieving the statutory objectives.

The legislative history supports the Commission's interpretation. *See Pharm. Rsch. & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001). Section 3622(d)(3) was not in the versions of the bills initially passed by the House and Senate; the Senate bill retained a price cap while the House bill contained a price cap that could be eliminated after notice and comment. H.R. 22, 109th Cong. § 201(a) (as passed by House, July 26, 2005); H.R. 22, 109th Cong. § 201(a) (as passed by Senate, Feb. 9, 2006). Subsection (d)(3) was added during the House-Senate Conference and thereafter enacted by both Houses of Congress. *See* 152 Cong. Rec. H9160–H9182 (daily ed. Dec. 8, 2006); *id.* at S11,821–S11,822 (daily ed. Dec. 8, 2006). The primary Senate sponsor of the conference bill, Senator Susan Collins, addressed the provision on the floor of the United States Senate:

> After 10 years, the Postal Regulatory Commission will review the rate cap and, if necessary, and

following a notice and comment period, the Commission will be authorized to modify or adopt an alternative system.

While this bill provides for a decade of rate stability, I continue to believe that the preferable approach was the permanent flexible rate cap that was included in the Senate-passed version of this legislation. But, on balance, this bill is simply too important, and that is why [the conferees] have reached this compromise to allow it to pass. We at least will see a decade of rate stability, and I believe the Postal [Regulatory] Commission, at the end of that decade, may well decide that it is best to continue with a CPI rate cap in place. It is also, obviously, possible for Congress to act to reimpose the rate cap after it expires.

152 Cong. Rec. S11,675 (daily ed. Dec. 8, 2006) (statement of Sen. Collins). The Senator's remarks reinforce the plain meaning of the statutory text: during its ten-year review, the Commission may adopt an alternative system and is not necessarily constrained the price cap.

The Mailers additionally maintain that the Commission's interpretation of the statute runs afoul of the nondelegation doctrine and should be rejected on constitutional avoidance grounds. Mailers Br. 26–30. But this argument, too, is unavailing. A statutory delegation of authority is constitutional so long as Congress has provided an "intelligible principle to which the person or body authorized to [act] is directed to confirm." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). To date, the Supreme Court has found "the requisite 'intelligible principle' lacking in only two statutes, one of which provided literally no guidance for the

exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Id.* at 474 (citing *Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)). Section 3622(d)(3), by contrast, provides an intelligible principle to guide the Commission by requiring that alterations to the ratemaking system be "necessary to achieve the objectives" in § 3622(b), which enumerates nine criteria.

**B.**

The Mailers next contend that the Commission's ratemaking system is arbitrary and capricious because it fails to achieve statutory objectives. They also raise issues with the density-based rate adjustment specifically and contend that the Commission erred by not updating its analysis in response to the COVID-19 pandemic. Mailers Br. 30–48.

Here, the court's review is deferential, reflecting "'reluctan[ce] to interfere with [an] agency's reasoned judgments' about technical questions within its area of expertise." *Alliance of Nonprofit Mailers v. Postal Regul. Comm'n*, 790 F.3d 186, 197 (D.C. Cir. 2015) (quoting *NRG Power Mktg., LLC v. FERC*, 718 F.3d 947, 953 (D.C. Cir. 2013)). An agency need only articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation omitted).

Two features of *Order 5763*'s regulatory regime weigh in favor of deference. First, the Accountability Act requires the Commission to consider nine objectives. 39 U.S.C. § 3622(b). "[O]ur review of agency decisions based on multi-factor

balancing tests . . . is necessarily quite limited. We may not merely substitute the balance we would strike for that the agency reached." *U.S. Postal Serv. v. Postal Regul. Comm'n*, 963 F.3d 137, 141 (D.C. Cir. 2020) (quoting *USAir, Inc. v. Dep't of Transp.*, 969 F.2d 1256, 1263 (D.C. Cir. 1992)). Second, the Commission's decision depends on "predictive judgments about the likely economic effects of a rule," which are "squarely within the ambit of the Commission's expertise." *Newspapers Ass'n of Am. v. Postal Regul. Comm'n*, 734 F.3d 1208, 1216 (D.C. Cir. 2013) (alteration adopted; citation omitted). The court's "narrow task" is thus "to ensure that the Commission sufficiently supported its analysis." *Id*.

**1.**

The Mailers maintain that the Commission's ratemaking system is arbitrary and capricious because it will both "upset the prior system's successes in achieving multiple objectives" and "aggravate" its "failure to achieve other objectives." Citing the statutory objectives in § 3622(b), they contend the new system will weaken incentives to cut costs, harm rate predictability and stability, render rates unjust and unreasonable, reduce transparency, and exacerbate the existing system's failure to incentivize efficiency improvements. Mailers Br. 31, 33–34.

***Maximizing incentives to improve efficiency*:** Before the Commission, the Mailers argued that giving the Postal Service additional rate authority would weaken incentives to be more economical and efficient because the Postal Service would cover its costs through rate increases. Comments, Alliance of Nonprofit Mailers, at 14–18 (Feb. 3, 2020). The Commission disagreed. *Order 5763* at 298–310. It stated that although a price cap "[t]heoretically" incentivizes the regulated entity to reduce costs and increase efficiency, the Act had failed to do

so because factors outside of the Postal Service's control had resulted in its costs far exceeding its revenues. *Id.* at 301–02. Therefore, the Commission explained, "providing the Postal Service with the needed pricing tools to narrow the existing formidable gap between revenues and costs" would incentivize the Postal Service "to bridge that gap fully via efficiency gains and cost reductions." *Id.* at 303. Further, the Commission found that the supplemental rate authorities would not weaken efficiency incentives because they compensate the Postal Service for costs that are "largely outside of its direct control." *Id.* at 304. "By closely tailoring the modifications" to these exogenous costs, the Commission can "provide correct incentives and . . . encourage prudent pricing and operational decision-making by the Postal Service." *Id.* at 302.

*Maintaining predictable and stable rates*: The Commission found unpersuasive the Mailers' argument that the new ratemaking system would produce excessive price hikes, explaining that the rate authorities limit the maximum allowable annual rate increase. *Id.* at 312. It also concluded that "[t]his concern fails to account for the Commission's findings and analysis, which extensively discusses the deficiencies of the existing ratemaking system," namely that it failed to maintain the Postal Service's financial stability and resulted in unreasonably low rates. *Id.* at 313. The Commission further found that the Mailers' concern overlooked that the Postal Service has "inherent incentives to exercise business judgment" and not raise rates too sharply. *Id.* at 314. Further, the use of rate formulas would minimize unpredictable price fluctuations and allow for forecasting. *Id.* at 315.

*Increasing transparency*: The Commission found that the new ratemaking system was consistent with the statutory objective of promoting transparency because it "provided a

thorough, publicly available explanation" of the rate authorities, "the formula uses inputs from publicly available data and information," and it would "maintain[] the underlying calculations on its public website, similar to existing practice." *Id.* at 349. Additionally, the Commission concluded that "[a]ny additional administrative burden associated with the calculation is minimal and justified by the need to address underlying drivers of the existing system's deficiencies." *Id.*

***Establishing just and reasonable rates*:** In *Order 5763*, the Commission rejected as "largely overstated," *id.* at 352, the Mailers' concern that the new rate system would unjustly enrich the Postal Service. Giving the Postal Service greater rate authority was necessary, in the Commission's view, to allow "the Postal Service to set rates that would not threaten its financial integrity." *Id.* The new system would also protect mailers because it "limit[ed] the accrual and use of rate authority to correct particular systemic deficiencies." *Id.* For instance, the Commission found that the density-based rate authority would not result in excessive rates because it does not constitute a rate reset, and its formula is designed to produce conservative cost estimates. *Id.* at 353–54. The Commission also found that the ratemaking system included "sufficient safeguards" to prevent excessive rate increases, pointing out that ratepayers may challenge rate changes before the Commission. *Id.* at 358–59.

Despite the Mailers' objections to the new ratemaking system, the Commission articulated a rational connection between the statutory objectives and the decision it made. Given the deference due to an agency's judgment about how to balance competing factors, *USAir*, 969 F.2d at 1263, the Mailers offer no basis for the court to conclude that the Commission's decision was arbitrary and capricious in meeting the statutory objectives.

**2.**

The Mailers challenge the density-based rate authority as arbitrary and capricious, because (1) it fails to account for per-unit revenue and therefore will "grossly over-recover delivery costs," and (2) it will accelerate, rather than remedy, the decline in mail density. The Mailers further maintain that the Commission failed to respond meaningfully to comments raising these objections. Mailers Br. 34–46.

The Commission adequately justified its density-based rate authority. First, it was not arbitrary for the Commission to reject comments that the density-based rate authority had to account for the mix of delivered mail and per-unit revenues. As the Commission explained, the "rate authority is designed to offset increases in per-unit costs" caused by declining mail density, "not . . . to offset contribution changes from individual mail classes." *Order 5763* at 95. Per-unit revenues are irrelevant, according to the Commission, because "changes to per-unit costs are not isolated to specific classes." *Id.* Rather, "[a]s overall volume decreases," the fixed costs associated with delivering the mail "are borne by fewer pieces, driving an increase in per-unit costs, irrespective of class." *Id*. Additionally, a revenue-based formula would tie the density authority to the Postal Service's pricing decisions, leading to inefficient pricing. *Id*.

Nor did the Commission irrationally reject the Mailers' argument that the density-based rate authority would accelerate volume loss. Before the Commission, the Mailers argued that the supplemental rate authority would trigger a "death spiral," a self-reinforcing cycle where price hikes induce further volume loss. Comments, Alliance of Nonprofit Mailers, at 28–39 (Feb. 3, 2020); Comments, Nat'l Postal Policy Council, 36–

38 (Feb. 3, 2020). The Commission, however, found that this argument rested on the faulty premise that market-dominant products are highly price sensitive. *Order 5763* at 82. In its "experience, demand for Market Dominant products has been relatively price inelastic": volumes "grew steadily" before 2006 when prices were not capped yet consistently declined during the price-cap era. *Id*. As a result, the Commission "expected" "the decrease in volume induced by the density-based rate authority . . . to be less in proportional terms than the amount of density-based rate authority." *Id*.

The Mailers maintain that the Commission's estimate of price sensitivity is too low, because it is calculated using data from a period when price changes were small relative to those anticipated with the new rule. Comments, Alliance of Nonprofit Mailers, at 31–32 (Feb. 3, 2020). But a disagreement over price sensitivity is insufficient to invalidate the Commission's order, as this court defers to the Commission's reasonable economic assumptions and predictions. *See Newspapers Ass'n of Am.*, 734 F.3d at 1216; *City of Los Angeles v. Dep't of Transp.*, 165 F.3d 972, 977 (D.C. Cir. 1999). Further, the Commission responded to the Mailers' objection by noting that the Postal Service did not have to use all available rate authority if doing so would be counterproductive. *Order 5763* at 83. The Commission also noted that it "retains the authority to revisit the density-based rate authority" if "volume effects are outside the expected range." *Id*.

And the Mailers object that the Commission ignored their comments that *Order 5763* overestimated density-related costs relative to the "roll-forward" method used in other contexts. But the Commission found that using a prospective method like the roll-forward method "would be more complicated," "entail more uncertainty," and "require an additional mechanism in

later years to correct for inaccurate projections." *Id.* at 91. Given that "[n]one of the commenters ha[d] shown that a forward-looking model would have sufficiently improved accuracy over the Commission's backwards-looking estimate," the Commission concluded that they had failed "to justify these tradeoffs." *Id.* at 91 n.136.

**3.**

Lastly, the Mailers maintain that the Commission "ignored evidence demonstrating that density and other new rate authorities are not necessary" because "the pandemic has spurred massive volume increases in profitable packages, improving [the Postal Service's] financial condition overall." Mailers Br. 46–47.

The Commission adequately supported its decision not to reopen the record. It found that the COVID-19 pandemic did not alter its finding that the existing ratemaking system failed to achieve the Accountability Act's objectives because "[t]he Postal Service's finances remain[ed] unstable" and "the problems identified in Order No. 4257 with respect to pricing and operational efficiency and unreasonable rates have not abated." *Order 5763* at 26–27. "These challenges," the Commission observed, "which all pre-date the pandemic, are expected to persist as long as the existing ratemaking system remains in effect, and nothing specific to the pandemic alters [its] findings with regard to these deficiencies." *Id.* at 27. The Commission therefore "[did] not find any good cause to further delay implementation of the [new] ratemaking system," and stated that it would "intervene as necessary if economic conditions prevent the final rules from operating as intended to achieve the objectives of section 3622." *Id.* at 31.

The Mailers further submit that the Commission relied on "stale data" from 2019, and that the Postal Service's revenue and cash position meaningfully improved by mid-2020. Mailers Br. 48. But in *Order 5763*, the Commission noted that pricing authority should be determined not by revenue, but by costs, and that "as a result of the pandemic[,] there are fewer total mailpieces today over which the costs of servicing and maintaining the Postal Service's network can be distributed." *Order 5763* at 28–29, 95. The mid-2020 financial data cited by the Mailers does not invalidate the Commission's reasoning. Moreover, in response on appeal the Commission points out that the Postal Service's financial condition worsened by the end of 2020, as indicated by operating losses comparable to those in previous years and declining profitability. P.R.C. Br. 72 (citing its financial analysis and 10-K Statement, Fiscal Year 2020).

**III.**

The Postal Service also contends that *Order 5763* was arbitrary and capricious, but advances arguments diametrically opposed to those of the Mailers.

**A.**

The Postal Service first maintains that the Commission's new ratemaking system defies reasoned decision-making by "not actually provid[ing] [it] with an opportunity to cover its costs" and so "perpetuates the same faults that [the Commission] found in the legacy system." USPS Br. 27. Analogizing its situation to that of a bicycle tire with a leak, the Postal Service argues that the Commission's new system had not only to account for future revenue loss (*i.e.*, patch the hole) but also return rates to a compensatory level (*i.e.*, reinflate the tire). *See id*. at 28–29. Because the new system does not reset

rates, the Postal Service posits that its financial stability remains insecure, making *Order 5763* arbitrary and capricious "on its [o]wn [t]erms." *Id.* at 26–27, 30–31.

In *Order 5763*, the Commission addressed the Postal Service's argument that its proposed rate authorizations were inadequate to achieve financial stability because they did not reset rates to fully compensatory levels. *Order 5763* at 347–48. The Commission explained that it "ha[d] never asserted that the Market Dominant ratemaking system must immediately recover all of the historic net losses or reset all rates to a level sufficient to cover all costs." *Id.* at 347. Such a system "would fail to balance" the competing objectives of rate stability and predictability and maximizing efficiency incentives because it would "incentivize the Postal Service to *solely* raise rates to respond to its challenges." *Id.* In contrast, the supplemental rate authorities balanced these objectives because they "mitigate the imminent financial pressure on the Postal Service, correct certain harmful pricing practices, and retain sufficient incentives to pursue cost reductions and efficiency gains." *Id.* Further, "[g]iven that the near-term financial instability is a source of imminent peril," the Commission concluded that it was reasonable "to address those more time-sensitive issues first and then evaluate how the longer-term financial stability issues should be addressed, in conjunction with the other objectives, under the modified ratemaking system." *Id.* at 348.

This explanation satisfies arbitrary-and-capricious review. The Accountability Act instructs that the nine objectives "shall be applied in conjunction with [each other]." 39 U.S.C. § 3622(b). Following that directive, the Commission reasonably concluded that although a rate reset might further the goal of financial stability, it would undermine other objectives. It explained that allowing the Postal Service to

cover its costs solely through rate increases would discourage, not incentivize, cost-cutting and efficiency improvements. *Order 5763* at 347. Further, a rate reset of the magnitude proposed by the Postal Service would "represent a regression" in progress toward achieving predictable and stable rates. *Id.* at 297. With these findings, it was not arbitrary for the Commission to choose a system that balanced the Act's competing objectives rather than one that maximized financial stability at the expense of other goals. *See U.S. Postal Serv.*, 963 F.3d at 141. Equally reasonable was the Commission's decision to address the problem incrementally. It is well settled that agencies need not solve a problem in a single rulemaking. *See Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 231 (1991).

**B.**

In a related challenge, the Postal Service maintains that the Commission failed to provide a reasoned explanation for deciding not to implement a rate reset. In its view, the Commission's "suggest[ion] that a rate reset is unnecessary" is contrary to the evidence, which shows that a rate reset is needed to return the Postal Service to financial solvency, as well as the Commission's own statements in *Order 5763*. USPS Br. 32–35. Further, the Postal Service maintains that the Commission inadequately explained its finding that a rate reset was contrary to some statutory objectives. *Id*. at 36–43.

The Postal Service's objections are unavailing. To begin, the record does not support the Postal Service's argument that the Commission suggested a rate reset is "unnecessary." The materials cited by the Postal Service merely state that the Commission has decided to adopt rate authorities tailored to specific costs; the materials did not state or otherwise suggest that the new ratemaking system rendered a rate reset

unnecessary. *Order 5337* at 60; *Order 5763* at 173. Nor is the Commission's decision inconsistent with the evidence or its prior statements. Rather, the Commission reasonably determined that implementing a rate reset "at this time" would be contrary to various statutory objectives. *Order 5763* at 347–48.

Finally, the Postal Service's challenge to the Commission's weighing of the statutory objectives is unpersuasive. The Commission explained that resetting rates to equal costs would weaken the Postal Service's incentive to cut costs and improve efficiency. *Id.* On the other hand, enhancing the Postal Service's rate authority so it can cover some of its costs through rate increases "narrow[s] the existing formidable gap between revenues and costs" thereby creating "meaningful" incentives to "bridge that gap fully via efficiency gains and cost reductions." *Id.* at 303. As for predictable and stable rates, the Commission explained that a sudden and significant price increase could harm mailers and mail volume. *Id.* at 196. Regarding just and reasonable rates, the Commission explained that the new regulatory system "balance[d] . . . differing views" and "would neither threaten [the Postal Service's] financial integrity nor would be excessive to mailers." *Id.* at 352–53. The Commission's decision not to implement a rate reset at this time was thus reasonable and reasonably explained.

Accordingly, the court denies the petitions for review.